## Groesch Estate

156

Before Klein, P. J., Bolger, Lefever, Saylor and Shoyer, JJ.

The facts appear from the following excerpts from the adjudication of

LEFEVER, J., August 9, 1962.—Guidor Groesch died September 8, 1958, unmarried and without issue. His closest next of kin was his sister, Lieta H. Schopfer.

Testator left a last will and testament dated March 18, 1958. Therein he directed the payment of his debts and funeral expenses and devised and bequeathed the residue of his estate "unto trustees or survivor" in trust to pay the net income unto his sister, Lieta H. Schopfer, for life. He provided further:

"If in the sole discretion of my said sister, the net income from this trust fund shall at any time be insufficient for the proper support, care, comfort and maintenance of my said sister, I hereby direct my said trustees or the survivor to pay unto my said sister such sums or amounts from the principal of this trust fund as she, in her sole discretion, shall determine.

"Third: If at any time my said sister shall desire to enter an old folk's home, my trustees or the survivor shall from the principal of the trust funds pay whatever she shall require to effect her entrance in such home.

"Fourth: After the death of my sister, Lieta H. Schopfer, I give, beneath and devise the principal of the trust fund mentioned in the previous paragraph, or so much as shall remain thereof, unto The Philadelphia German Protestant Home, of Lawndale, Pennsylvania. . . .

"Lastly: I nominate, constitute and appoint Horace A. C. Kopp and my sister, Lieta H. Schopfer, to be the executors of this my last will and testament and the trustees thereunder."

Mrs. Schopfer is 68 years old. She is almost totally blind. She is diabetic. She has a chronic heart condition. She suffered an apoplectic stroke the day before testator was buried, with resultant paralysis of her right hand and a speech defect. Consequently, she is in need of constant supervision and assistance in her daily life. Because of her physical ailments, Mrs. Schopfer, under date of September 24, 1958, signed a document reading: "The undersigned Lieta H. Schopfer, one of the executors named in the will of the above decedent, hereby renounces my right to administer on sais [sic] estate, and respectfully asks that letters testamentary be issued to Horace A. C. Kopp." On September 25, 1958, this document was filed with the register of wills, and letters testamentary were granted to Horace A. C. Kopp.

Under date of July 26, 1961, Mrs. Schopfer filed a petition to show cause why Horace A. C. Kopp "should not be removed from his office as executor and trustee[1] and the letters testamentary vacated, and he be ordered to file an account." On the same date, Judge Shoyer signed a decree issuing the citation. Under date of October 11, 1961, an answer to the petition was filed. Thereupon, the president judge referred this petition and answer to the auditing judge for disposition. . . .

It is clear from the evidence adduced that the winding up of this estate has been unduly delayed and that there have been errors of omission and commission in the administration of the estate. These are directly attributable to William C. Schwebel, Esq., counsel for the accountant. For many years an able, highly re-

---

[1] "and trustee" was added by amendment to the petition at the first hearing.

spected member of this bar, he is now aged, ill and haunted by a personal tragedy (the accidental death by asphyxiation of his daughter and son-in-law). At the time of the last hearing his hospitalization for illness prevented him from being present in court.

Mr. Schwebel took full responsibility for the delay. The executor stated quite frankly that he sought and followed his advice in each step of the administration.

Most of the matters justly complained of by Mrs. Schopfer have been cured since the first hearing. The complaints and the steps taken to eliminate them may be summarized as follows. . . .

2. *Retention of part of the estate in cash.*

Nearly $10,000 was held in a checking account for a period of more than a year. This, of course, produced no income during this time. The accountant's explanation was that Mrs. Schopfer was making constant requests for payments out of principal; that beginning October 3, 1958, the accountant paid her the regular sum of $50 per week, and after November 21, 1961, pursuant to an informal order of the entire court made on that date, $125 per week; and that he paid other substantial bills in addition. Furthermore, he had requested his counsel to prepare an account and confidently expected the account to be prepared and filed promptly. Therefore, in his opinion, it was the part of wisdom to retain a portion of the assets in a checking account so that cash would be available as Mrs. Schopfer's needs required.

There is no provision in the law requiring an executor to invest the assets in his possession. Section 506 of the Fiduciaries Act of April 18, 1949, P. L. 512, provides: "Subject to his duty to liquidate the estate for prompt distribution and the provisions of the will, if any, the personal representative may invest the funds of the estate but shall have no duty to do so. . . ." It is clear from this provision that the executor had the *discretionary right* to invest, but *no duty* to do so.

A fortiori, he cannot be surcharged for failing to invest, whatever his reason. Moreover, in this case, his retention of cash on hand for the purposes stated was valid and proper. Finally, a substantial part of the estate was invested in Government bonds. In view of the broad "consumption of principal" clause, retention of a cash fund was not irresponsible, but prudent.

3. *Delay in payment of bills.*

Mrs. Schopfer incurred substantial doctors' and hospital bills during her various illnesses. She requested accountant to pay them. He refused, or, at least delayed, payment of these bills.

Under the terms of the second paragraph of the will, these bills should have been paid promptly. The language of the will is clear on this point. However, accountant explained his failure to pay these bills (a) upon his understanding that the $50 per week, later increased to $125 per week, which he paid to her, was to cover all of her expenses including doctors' and hospital bills; and (b) the accountant was advised by his counsel not to pay these bills without the approval of The Philadelphia German Protestant Home, the remainderman. In our opinion, the approval of the Home was not necessary because of the broad powers in the will. It follows that accountant's counsel was guilty of an error of law in his advice. However, the bills of the hospitals and doctors have now either been paid or are herein directed to be paid forthwith. This delay has been a matter of annoyance, and even embarrassment, to Mrs. Schopfer, but the obligation is herewith liquidated. Accountant's conduct is subject to criticism; however, there is no basis or formula for translating it into a money surcharge. . . .

5. *Premature payment of executor's commissions and counsel fees.*

The accountant paid a commission of $2,415 to himself, and a fee of $2,500 to his attorney on December

2, 1958, long before the administration had been completed. For an accountant to pay compensation to himself and his attorney a few months after grant of letters and then require the beneficiary to wait four years for accounting and distribution is, to say the least, indecorous. However, the ultimate test is whether or not the commission and fee were earned and deserved. The auditing judge is satisfied that the accountant complied with his duties. The estate has been properly administered albeit the administration has taken overlong. The delay is the fault of the accountant's counsel. Moreover, the auditing judge is mindful of the conduct of accountant in paying interest and penalties on inheritance tax and reimbursing the estate for the real estate brokerage commission. Accordingly, the auditing judge allows the commission upon principal which the accountant has paid to himself, and commissions on income now claimed.

Counsel fee is another matter. Mr. Schwebel has been slothful and negligent in the performance of his duty in this estate. His illness, age and concern over his personal tragedy deserve and receive our pity and understanding. However, it is not a legal excuse for failure to perform his duty. The auditing judge is mindful of the fact that counsel has performed substantial services. Taking into consideration all the facts and circumstances in this estate, the auditing judge reduces the fee of Mr. Schwebel to $1,000, and surcharges the accountant for the difference between this amount and the $2,500 for which credit is taken in the account.

The auditing judge allows counsel fee on income in the amount of $250 to Simon Lenson, Esq. This will in part compensate Mr. Lenson for his valuable services. Accountant and Mr. Schwebel will be personally responsible for any additional reasonable fee which he sees fit to charge. . . .

### 7. *Who shall serve as trustee?*

Mrs. Schopfer contends that her renunciation as executrix was conditional, and that she is now entitled to qualify as executrix and trustee.

As stated above, the administration of the estate has been completed, except for distribution. It would be a futility to have her become an executrix at this state of the administration even if she were entitled to do so. However, she is not so entitled. Her renunciation as executrix is clear, unequivocal and unconditional. She is bound by it.

There is diversity of opinion in the cases as to whether a renunciation by a person to serve as executor constitutes a renunciation to serve as trustee. See Sadler's Estate, 303 Pa. 279. Apparently each case depends upon the particular facts.

In the instant case, the reason that Mrs. Schopfer gave for her renunciation was her ill health and physical incapacity. That condition continues.

Mrs. Schopfer is not physically or mentally capable of serving as trustee. The pastor of her church whom she called as her witness, when asked the direct question whether she was mentally competent, replied that in his opinion "it is probable" that Mrs. Schopfer might become a victim of designing persons.

Mrs. Schopfer was on the witness stand for more than an hour. The auditing judge closely observed her during this time. She had to be led to the witness stand and carefully helped to take the one step into the witness box—at that, she slightly stumbled. She obviously could not see the witness box. Later, she could not see a piece of paper or even the hand of the lawyer holding it as he extended it to her. For all practical purposes, she is totally blind. Her answers were evasive, confusing and contradictory. She did not know, or refused

to testify, how much it cost her to live. She was extremely vague as to what investments she would make or approve as a trustee. One thing was patent throughout her testimony—her unreasoning dislike for The Philadelphia German Protestant Home and her bitter resentment that her brother had named it as the remainderman in his will. Her sole motive and objection in this litigation were transparent, namely, to have the entire estate awarded to her so that she could deprive the Home from receiving any part of it.

The auditing judge finds as a fact, from the testimony of other witnesses and from his own observation of Mrs. Schopfer during the several days of hearing, and particularly while she was on the witness stand, that she is not physically or mentally capable of carrying out the duties of the trustee of this estate.

Section 331(3) of the Fiduciaries Act of 1949 provides that the court shall have exclusive authority to remove a personal representative when he "has become incompetent to discharge the duties of his office because of sickness or physical or mental incapacity and his incompetency is likely to continue to the injury of the estate." Mrs. Schopfer's physical and mental condition is such as to warrant removal if she were serving as a fiduciary. A fortiori, the court has the power to refuse to permit her to begin the duties of trustee.

Horace A. C. Kopp stated in open court that he was willing to serve as trustee or would renounce as the court saw fit. In view of the broad discretion with respect to consumption of principal for the life-tenant which the will vests in the trustee and the strong animosity which Mrs. Schopfer bears towards Mr. Kopp, it would be most difficult for him fairly and properly to serve as trustee. The court, therefore, accepts his proffered renunciation.

Accordingly, the auditing judge, by separate decree signed contemporaneously herewith, has appointed The

Provident Tradesmens Bank and Trust Company as sole trustee of this trust, and the balance for distribution will hereinafter be awarded to it.

8. *Interpretation of the will.*

Mrs. Schopfer takes the position that the will gives her this estate in fee. She requests, therefore, that the balance for distribution be awarded to her outright.

A careful study of this will, the relevant paragraphs of which are quoted supra, reveals the following:

(a) The primary beneficiary, whose interest is paramount, is testator's sister, Lieta H. Schopfer.

(b) Testator invested Mrs. Schopfer with broad discretion to request distribution of principal to her.

(c) The only limitation upon the exercise of discretion was that the principal be used "for the *proper* support, care, comfort and maintenance of my said sister." (Italics supplied.)

(d) Testator was anxious that Mrs. Schopfer be cared for during the rest of her life. This includes protecting her from destitution, even against herself.

(e) The third paragraph of the will visualizes the possibility, which has come to pass, that Mrs. Schopfer might not be able to take care of herself in her own home. With that possibility in view, testator made provision for her to enter an "old folk's home," namely, "my trustees or survivor shall from the principal of the trust funds pay whatever she shall require to effect her entrance in such home."

(f) At her death any part of his estate which remains is given to The Philadelphia German Protestant Home.

In short, the paramount intention of testator was to protect his sister and care for her during the rest of her life. He assuredly did not intend her to squander and fritter away his estate, or exhaust it for expenses which were not for her proper support. Moreover, he

did not intend that she should use such a large portion of the estate in one year that she would wind up in abject poverty.

The evidence reveals that the home in which Mrs. Schopfer lives is owned, as tenants by the entireties, by herself and her husband, who separated from her in 1951. For some time after the separation her husband made payments for her support, but those payments have now ceased. Nonetheless, she has recently made extensive improvements and repairs to the property, which would inure to the benefit of her deserting husband, should she predecease him. The law provides a means for resolving the problem of joint ownership of real estate in this situation. However, Mrs. Schopfer has failed to avail herself of it. Therefore, no allowance out of principal for payment of these repairs is granted.

In the course of the many conferences with counsel for the interested parties during the litigation in this case, and from Mrs. Schopfer's testimony, it appears that she seeks such sizeable weekly payments out of principal that this estate will be consumed in three or four years. Despite the serious maladies from which she suffers, she may well live much longer than this. It is noteworthy that accountant has thus far distributed to her cash in the amount of $11,650, and paid doctors' and hospital bills of more than $1,500. It would be a tragedy to exhaust this estate by overpayments weekly and leave her penniless for her final years. This was not testator's intent.

The evidence as to Mrs. Schopfer's needs and expenses is fragmentary and general. However, it would appear that $75 per week, plus her Social Security of $50 per month, should be ample to take care of her present needs. This includes food, clothing, taxes, taxicab fare, doctors' bills, wages for her attendant, etc. The auditing judge is mindful of the fact that she is

"also living in a house, rent free, tax free, supported by her husband . . ." Therefore, from the date of this adjudication until this order is changed, the court directs the trustee to pay her $75 per week out of principal and income.

The trustee is directed to make an immediate independent investigation into the needs of Mrs. Schopfer and the amount required for her "proper support, care, comfort and maintenance", and when that investigation has been completed to file an appropriate petition for authority to increase or decrease the weekly payments, as the needs may be. Of course, the trustee may always consider a request by Mrs. Schopfer for additional principal in the event of an emergency.

An original account and an amended account were before the court at the audit. Many errors appeared therein. Since the audit, a second amended account was filed, which reflects all of the additional items of debit and credit until June 6, 1962. Awards will be based on the second amended account . . .

And now, to wit, August 9, 1962, the account is confirmed nisi.

*John R. Sutton*, for life-tenant, exceptant.

*William C. Schwebel*, p.p., exceptant.

*A. Groh Schneider* and *Simon Lenson*, contra.

### Opinion Sur Exceptions

SHOYER, J., December 7, 1962.—We are convinced that the learned auditing judge was correct in refusing the life-tenant a fee in her brother's estate, even though his will gave her the "sole discretion" to invade principal for her *"proper* support, care, comfort and maintenance". (Italics supplied.) In addition to the full and complete analysis of the will made by Judge Lefever in his adjudication, the weekly contributions of $50 furnished for her living expenses by the brother

in his lifetime supply us with strong evidence of his testamentary intent. Previous decisions by Pennsylvania courts have established the rule that the life-tenant's requests for principal should be tested by her good faith. "The test . . . is the good faith of the action of the beneficiary. If it is an honest exercise of the discretion with which the testator has clothed [her, her] action is conclusive, but [she] cannot be permitted to make use of the mere form to defeat or evade the true intent and pervert the gift to a different purpose": Estate of Charles Tyson, 191 Pa. 218, 228. Judge (now President Judge) Klein applied this test, found good faith and granted the request in Ray's Estate, 39 D. & C. 502. Here, the auditing judge found that testator's sister was motivated by her strong and outspoken animosity toward the charitable remainder-man. Her failure to enforce her court order for support against her estranged husband by enlarging her share of ownership in her own home pursuant to the provisions of the Act of May 24, 1923, P. L. 446, 48 PS §§ 137-140, is additional evidence of her deliberate disregard of her brother's intentions in order to achieve her own ends. See also Johnson Estate, 359 Pa. 645; Lovett v. Farnham, 169 Mass. 1, 47 N. E. 246. Cf. Seacrist Estate, 362 Pa. 190.

The same physical disabilities which led the life-tenant to renounce unconditionally her appointment as co-executrix have persisted and worsened in the four years since testator's death, so that undoubtedly it would have been a mistake for the learned auditing judge to have allowed her to qualify as a trustee. Her complaint of the commission allowed the executor, which was at the usual five percent rate, appears based on her counsel's mistaken belief that her nomination by testator was equivalent to a legacy of 2.5 percent of the gross estate. Of course, there is no basis in law or equity for converting an appointment to *serve* with

compensation into a *gift* relieved of the anticipated service.

Other exceptions filed on behalf of the life-tenant were neither argued nor briefed. We have carefully considered all of them, however, and find that the excepted rulings of the learned auditing judge were free from error and his reasons for the same were adequately stated in his adjudication.

At the call of this case for argument, Mr. Schwebel requested and obtained our leave to file exceptions to the surcharge of 60 percent of his counsel fee. We received his exceptions at this late date, and, in addition, we heard his oral argument though unaccompanied by a written brief as required by our Rule ★1.2(c). At both the audit and the argument he admitted his own negligence as counsel for the estate, and that the delay in administration was attributable to him, not the executor. It is not denied that the life-tenant had to obtain special counsel to cite the executor to file an account which Mr. Schwebel had undertaken to prepare for him. The record also shows that she was embarrassed and suffered great worry and distress because of the dunning methods resorted to by the hospital to effect payment of her long-standing bills. A proper and timely administration could have saved this ailing woman much heartache. Despite the surcharge of $1,500, Mr. Schwebel has been allowed to retain the substantial sum of $1,000. It is unthinkable that this life-tenant, the primary object of her brother's bounty, should bear an unjustified financial burden in addition to her mental anguish. This court should not condone the negligence of Mr. Schwebel and at the same time penalize the estate, or this life-tenant, by saddling either one with the expense of special counsel whose retention was caused by the very same dereliction which exceptant confesses. The allowance of counsel fee is peculiarly within the discretion of the audit-

ing judge who has heard the testimony of witnesses and carefully considered the other evidence in the case. While anyone of us might have fixed the amount of surcharge somewhat higher or lower, we are agreed that the learned auditing judge did not abuse his discretion in stating it as he did.

The exceptions of both exceptants are hereby dismissed, and the adjudication is confirmed absolutely.

